is 21-1885. Good morning, counsel. Good morning. Can you both hear me all right? Yes. Yes, I can hear you fine. All right. Mr., is it Bonderoff? It is. Thank you. Yes. Whenever you're ready, I'm going to reserve four minutes for Bob. All right. Also, I apologize. The camera, my computer is in the lower left-hand corner, and so it looks like I'm staring down at you. No, no, no problem. We'll just... We get a look down on all the time, Mr. Bonderoff. No, no, no. Judge Jordan's quite tall. At 5'8", I'm very accustomed to that, believe me. Oh, good, good. Okay. So, I want to start this argument with a few basic facts that I don't think are in dispute here, which is that Johnson & Johnson made a series of statements over a multi-year period in which it touted the safety of its talc product as being safe and free of asbestos. And those claims gave rise to two parallel cases. One is this one. One is a securities case, 10B5 class action, the Hall case. And there are, of course, a whole series of other cases out there in an MDL that are products cases. But we know all that, but I'm curious. What we have here is your appeal from a dismissal of a First Amendment complaint that you then And I'm curious about your proposed SEC disclosure, your proposed disclosure here. And I want to understand it as well as possible. Would it have required J&J to effectively admit liability in the talc products liability cases? Well, Your Honor, I don't think that it would constitute an admission of liability. But that very disclosure that we're seeking. Well, what would it look like? I didn't get a clear picture from your briefing as to, certainly, I didn't see any specific language. I didn't even get a clear view, and that may be my fault, as to what the disclosure would be or what it would look like. It's pretty important, isn't it? It is. The disclosure would be that they've known about their talc product having asbestos in it for quite some time. And trace amounts of asbestos, right? Yes. But they also are aware of scientific studies that that asbestos has been linked to cancer. And that, therefore, say, as they with 100% certainty that they're free of asbestos and free of carcinogens and completely 100% safe is a false representation. So, even if it didn't amount to an acknowledgment that there was liability in the products liability cases, what you're saying is they should have made a disclosure that would have been admitted liability in the SEC cases? Well, the disclosure that we're asking for wouldn't necessarily have admitted that liability either. I'm not sure how you can assert, Mr. Bondaroff, that they should have come out and said, we've known our products contaminated for years and that there are studies that show it causes cancer and we've been hiding it. And that that's not going to be a 10B5 problem, at least, leaving aside the products liability issue. Well, actually, it did become a 10B5 problem. Let me back up one step. Who's the they we're talking about? Who's the they that would make this disclosure? The J&J corporate folks or the J&J ERISA folks? I mean, who is they? No, the they would be the J&J corporate folks. What the ERISA folks, who in some cases do overlap with the corporate folks. What ERISA folks are supposed to do is make their best effort to try to make that disclosure happen. The ERISA folks are not supposed to take over the corporate disclosure responsibility, but they are supposed to try to effectuate the corporate disclosure as best they can using whatever means are available to them internally without running a file of any other statute. In doing so, we're just asking that they make the same disclosure that the securities plaintiffs are asking that they would have made. You're up you are up against the more harm than good standard here, aren't you? We are. And how do you overcome that when you are suggesting a disclosure? And again, we don't have the specific language of it. And I'm still not clear on its contours that the ERISA trustees here had to in the other cases. Your Honor, I... Doesn't the stock automatically tank once that information gets out there? Your Honor, I would respectfully suggest that the reason why it seems like an admission of liability and why it would cause the stock price to go down is because the company was misleading the public. In other words, you're saying the reason it would do a lot of damage is because it would do a lot of damage because it seems like an admission because it is an admission. That sounds like what you're acknowledging, Mr. Bonnera. I mean, the company is ready to continue to maintain its positions, the arguments that it makes in defense of these claims, as it's doing in the securities case and as it's doing that misrepresentation that inflated the stock price occurred. Okay. And since the standard is the more harm than not standard, since you're explicitly not making an SEC disclosure claim here, you're making a breach of the duty of prudence claim under ERISA and the standard is what we've just discussed, how do you meet that standard? It's not that people don't have rights against J&J if there's been product liability or if there's been a failure to abide by the securities laws. As you've noted, those cases are going on. And in fact, a whole bunch of them are in front of Chief Judge Wolfson. The question is whether you can meet the standard for this kind of claim. And she said, no, you can't because you can't meet that more harm than, you can't surmount the more harm than good standard. How do you surmount the more harm than good standard when it seems inevitable that if they come forward and say, you know, we did it, we shot them. If they do that, the stock price tanks. Well, I would suggest that the standard, the application of more harm than good that Judge makes it virtually this kind of claim under any circumstances. Because if you are alleging that the stock price is artificially or buying it in an artificially high price, and that's the breach of duty, then the solution to that problem is going to be to correct. Which means automatically, it is a given that the disclosure we are advocating for will lower the stock price. That's the point. But if that's the end of the analysis under more harm than good, then these cases can't be brought anymore. Well, is your fight then with Dudenhofer and the Supreme Court and not with Judge Wolfson or us? How can you read the standard that Dudenhofer sets? And granted, it seemed that Dudenhofer was an effort to make it possible to bring these claims. Right? But they chose the standard they chose. And the case law that's developed in the Courts of Appeals and the District Courts since, it seems to be applying the standard just the way Judge Wolfson did. That's what it looks like. How do we get past what the Supreme Court said? Because it sounds like your fight is saying, that's a bad standard. But it is what it is. How do we read that in a way that you still win? I don't think it's a bad standard at all. I think the standard is all right. I do take issue with the way it's been applied in most of the courts. And I fully acknowledge that the vast amount of case law out there on this point, favors appellees here. We are asking this court to go against some of its sister courts in other. And we are asking them to look at more harm than good, not the way that the 5th or 8th or 6th circuits have. But to look at what the Supreme Court actually said in Dunar. And to look at what the statute itself says. The statute says that these claims are not supposed to be subject than any other breach of the duty of prudence claim. What could the ERISA trustees have done here to satisfy your position? What could they have done to do more good than harm? Two things. One, done everything in their power to try to effectuate a corrective disclosure through the means of securities laws, corporate disclosures. But doesn't that put you back in the position once the disclosure is made that this is not going to take a big hit? Well, that argument could be used against any disclosure of malfeasance by any company. That's not an answer. Well, with all due respect, I think it is. Because there have to be times where malfeasance, no matter how bad it's going to be for the company to disclose it, it's still better than keeping it a secret for even longer and hoping you'll get away with it indefinitely. Well, what you seem to be asserting is this inevitable discovery argument that you've made in your briefing. But how is one to assess whether or not it's better for a prudent fiduciary to say, we should just go out there right now. Even if we don't know all the facts, we should just go out there right now and tell the market that we've been giving women ovarian or cervical cancer for years. We should say that. And we knew we were doing it. As opposed to, we should keep our, to coin a phrase, we should keep our powder dry. And we should- I hope you haven't been rehearsing that, James Jordan. I have not. I have not. I'm ashamed to say it just came to me. And we should wait for information to develop and then go to the market. Because your position has to be, earlier disclosure is ipso facto better than later disclosure. Because later disclosure is inevitable, right? Before I answer, my clock just told me that my time is up. No, please answer. Please answer. Okay, thank you. Your Honor, our position is not that earlier disclosure is always better. Our position is that earlier disclosure here would have been better because after the point at which our class period begins, disclosure through other means, particularly the lawsuits that were going on, had become more likely than not. Not 100% guaranteed inevitable, because that's impossible to know for sure. But more likely than not, our class period, I would note, is significantly shorter than the class period in the securities case. How does Dudenhofer frame that claim, Mr. Bondaroff? How does Dudenhofer frame the standard? Is it that no prudent fiduciary could think this would do more harm than good? That is how it's phrased. It is phrased in a sort of in the negative. Yes, okay. Yes, that's the difference. So what you're saying is in this case, you think the record is so clear that no prudent fiduciary could say, we're better off waiting. Leaving aside the securities laws and the product liabilities laws, which we have to do. To win, your position has to be nobody who's prudent looking at this set of facts could say, it's better to wait, right? Well, I would suggest that the word prudent in that formulation is doing a lot of the work. Yeah, it says no fiduciary could believe this, and that's true. But it's no prudent fiduciary. Implicit in the definition is the idea that fiduciaries would make a prudent decision. If we say that the standard is there's no fiduciary that one could possibly imagine who might not want to do, again, that will foreclose all claims of this nature. And the statute, Congress made it clear that these types of plans, employee stock plans are to be governed, not just by the securities laws, but by ERISA too. Okay. It's a difficult, uncomfortable, conflicted situation, but Congress created that situation and we can't pretend it doesn't exist. I respectfully reserve the rest of my time for rebuttal.  Thanks. Mr. Blocker. Good morning, your honors. My name is Mark Blocker, and I represent all of the appellees in this case. I'm going to start with the more harm than good standard because your honors have asked a number of questions about that. And frankly, this court could affirm solely on more harm than good grounds. I want to start by answering a question that I think it was Judge Smith asked. And the question is, what was the disclosure we were being asked to make? And make no doubt about it. The company was being asked to essentially admit guilt. They were going to be taking a position that would have harmed them in thousands of product liability cases. Well, aside from result, harm or no harm, I assume it would be what is requested would be at odds with the position that the company has taken in the cases that are in the MDL, the products cases, which I assume have been vigorously defended. That's correct, Judge Smith. And put yourself into the shoes of the fiduciaries in this case. When you get to the spring of 2017, when the class period starts, these documents, documents like these have been out in the trials that have already happened. And J&J is winning. We pointed this out in our brief. J&J has been winning lots of these trials that had occurred involving its top products, product liability cases. So what the plans are proposing is in the midst of what had been a string of fairly significant victories for the company to come out and make a judgment that would have been better at this point in time to admit guilt, which would have destroyed its defense in the product liability cases, would have led to other liability. And as their honors have already pointed out, tank the stock rights. That's why this case never got off the ground on more harm than good grounds. And I just want to review what the district court did here and talk about the two alternatives the plan has proposed. The district court found both of those alternatives failed the more harm than good test. One was the corrective SEC disclosure theory and one was the cash buffer theory. And I want to go through each of those briefly unless your honors have other questions. But I think it's worth pointing out at the very beginning. Mr. Bondroff said something that's important here. First of all, every appellate court, with the exception of Jander, has agreed that claims like these do not state a claim that they failed the pleading stage. And Mr. Bondroff was clear. Okay, then why don't you stop there, Mr. Blocker, and distinguish Jander. Yeah, that's fine, Judge. Mr. Bondroff is asking you to follow Jander and essentially create a larger circuit split with all the other appellate courts that have found these that weren't plausible. But here's why Jander's different, Judge Jordan. In Jander, this was a fax in Jander. So IBM had a business that was selling. It was selling its microelectronics division. And so it was going to start soliciting buyers. And as part of soliciting buyers, it was going to make its financials available to those buyers. The financials were over and were inflated. It was going to be obvious to any buyer that they were inflated. And so what the court said in Jander is there's a couple of things going on here. One is we think that any buyer is inevitably going to find out that the financials are inflated. And therefore, earlier disclosure, later disclosure, it doesn't matter. You're going to end up making disclosure. So it's no longer a question of later disclosure versus current disclosure. That's not true here. That's not true in our case. Because what you have in our case is an unknown impact. When the buyer in the IBM case gets the financials, they're going to know immediately. It's going to have a known impact. They can do the math. They're going to know the price of the company is overstated. They're going to make adjustments. And then when the company sells, that information is going to be disclosed. That's not what you have with J&J. OK. Then is there really a circuit split at all? I don't think there really is a circuit split in the sense of even if you think that inevitability of disclosure and the combination of an economic theory that the plaintiffs rely on here and inevitable disclosure isn't a way to go, it doesn't apply here. But what Mr. Bondroff is asking you to do is to vitiate the standard. That's where you do the circuit split, Judge. So does gender indicate that applying this standard, you can make out a claim? Yeah. And that's what happened in the gender case. The court, the Second Circuit concluded that when you looked at all of the facts in combination, that the plaintiffs had asserted an economic theory, they linked it factually to the facts of that case, which were there was going to be a known impact from disclosure of financial statements. And therefore, the court decided that it was plausible to believe that an earlier disclosure might have had a lesser impact. Can I ask you a question about PGRM? Does PGRM have anything to do with this case? It does, Your Honor. PGRM is relevant. We made two arguments on the- Is it a duty of loyalty case or a duty of prudence case? PGRM? Yeah. PGRM, I believe it's both, but the Supreme Court- It's a duty of loyalty case, isn't it? I think it's both, Judge, but it's really a question of who's a fiduciary. And what PGRM stands for is that when a corporate officer serves as a fiduciary, that person can wear two hats. She can wear a corporate hat. She can wear a fiduciary hat. And you only assign ERISA liability when they're wearing their fiduciary hat. I second Judge Jordan's question, which I hope I didn't interrupt. What does that have to do with the case before us? Because one of the things, Judge Smith, that the plaintiffs wanted is for us to make a corrective SEC disclosure. The fiduciaries on the committee did not have the power to do that in their fiduciary capacity. They had the power to do that in their corporate capacity. And so- I thought you said right at the jump, this case can be decided on the more harm than good standard. It can. Okay. If that's the case, then what does PGRM have to do with it? Why go there? Well, I guess two things. I guess I think of the arguments this way, Judge Jordan. So here's where PGRM is relevant. First is whether SEC disclosure, is that a viable alternative action under Dudenhofer? And we would say it's not a viable alternative because it has to be taken in a corporate capacity. That's where PGRM comes in. I'm still not following you. I'm not trying to be obtuse. But if you win on the standard, on the no more harm than good standard, why would any of this matter? Yeah, no. That's why I said at the outset, and you pointed this out, Judge Jordan. We can win solely on- PGRM is an alternative that we don't have to reach if you prevail on more harm than good, right? That's correct. That's correct. That's a better way of saying what I've been trying to say inartfully, which is there are two issues here with respect to SEC disclosure. One is, is it a viable alternative? Is it a viable fiduciary alternative? And second, does it meet more harm than good? You can rule in our favor on that alternative on either ground. But Judge Jordan's correct. If you want to only deal with more harm than good, this case can be resolved fully on the more harm than good standard. Because obviously, the SEC disclosure theory, for all the reasons that this report said and all of the reasons your honors are articulating, did not meet the more harm than good standard. A prudent fiduciary could conclude that it would have been devastating, more devastating to make a disclosure at that point in time without all the facts known about the presence of asbestos in the TELC products, rather than wait it out and see what happened in the product liability cases. And any prudent fiduciary could have made that judgment. And as Mr. Bondaroff pointed out, the standard is, is there no prudent fiduciary who could have made that judgment? And that's what the district court said. Any prudent fiduciary could have made that judgment. So it fails the more harm than good test. So SEC disclosure theory, that's not going to get the plaintiffs home. The other alternative the plaintiffs proposed was the cash buffer theory, which was essentially an argument that the plaintiff, that the plaintiff fiduciary should have stopped purchasing stock. They still would have had to sell stock. But in any event, it requires the same disclosure that you would have in the SEC disclosure series. So it fails the more harm than good test for the exact same reason that the SEC disclosure theory failed. A final comment, Your Honor. There's a reason, there's a reason these claims are hard to bring. They ought to be hard to bring. These are, all 401k investments are meant to be long-term investments. Fiduciaries are charged with making sure that the investments they have in the plan are sound long-term investments, periodic blip in what's going to happen with the stock price of any given investment is not a grounds to find that a fiduciary acted imprudently. So unless there are any other questions, we would ask that you affirm the district court's judgment. Judge Jordan? I've done good, thanks. Thank you. Thank you, Mr. Walker. Mr. Bundro? You know, listening to the arguments and questions of this panel, I was struck by something, which I confess, I don't know that we're all, we need to find a way to reconcile. We're all talking about the proposed disclosure here as if it would be an admission of guilt and therefore would tank the stock and therefore is an impossible ask. Well, one of the problems, I don't think that's the case, but even assuming it were, one of the problems we have, as I tried to make clear at the outset in my questions, was that we don't have what I would consider some clear guidance from you as to what the disclosure should be or even its contours. So we're trying to figure out just what would be disclosed and what, speaking for myself, what I've heard is information that would be damaging in the marketplace. Well, the disclosure could be the misstatements about the talc products containing asbestos and about the studies they're aware of. They could also state their opinion as to why these are wrong, the same defense that they've offered in the product liability cases and make that part of the disclosure, but they would no longer be saying flatly across the board, there is no safety issue here, there's no danger here. This is the same argument that was made in the securities case at the motion to dismiss stage and it did not succeed there. Judge Wolfson found that it was okay to plead a claim for securities fraud here and that enough had been alleged to let it get past the motion to dismiss stage. Because there are two different standards, right, Mr. Bondaroff? That's the whole point. The securities laws set up different standards and set up different requirements and you're not bringing the securities case. I shouldn't say that. Maybe you're in the securities case too, but we're in the ERISA case. We're dealing with Dudenhofer. We're dealing with the prudent fiduciary rule. So it would help me if you would take a crack at why gender isn't distinguishable, right? Mr. Blocker has said why he says it is distinguishable and therefore there really isn't a circuit split. I tell us why no, gender is not distinguishable from your perspective and we should be guided by it. Gender is the right way to look at the more harm than good scheme. It shows right. Could you repeat that? You're breaking up in the courtroom here. I apologize. Gender is the right way to look at the Dudenhofer standard. It shows that the Dudenhofer standard is not supposed to be an insurmountable barrier because it says that when it becomes more likely than not that the disclosure you're trying to keep hidden is going to come out through some other means, then your choice is between disclose now or let it happen later. Okay. And that's where we get back to Judge Smith's question, which is the disclosure. What's going to come out? In gender, Mr. Blocker says what was going to come out was a defined and specific set of historical facts which were indisputable because they were a matter of record. Right? There was a record of losses and what they were and what the books were going to show. And that's different than what you're saying that the disclosure might be. That is that they have hidden something for years which shows that it was toxic and that they should have told people about it. Maybe I've misunderstood you, but I understand your position to be they needed to say to the market, guess what? We knew about asbestos contamination and talc for years and we didn't want to talk about it and we tried to tamp it down. Now, maybe I'm guessing wrong about what you're saying the disclosure ought to be, but this is where we're having difficulty is gender, there's a defined disclosure. Here, we're wrestling with what is it that you say inevitably would have come out? This is actually... Again, you're breaking up. We can't hear you in the courtroom. Mr. Blocker's characterization of gender is not correct. And I argued gender, so I'm pretty comfortable with the facts there. And I can tell you that IBM disputed vigorously the idea that their accounting of their microelectronics business was incorrect. They did not want to admit that they had inflated the value of this microelectronics business because they believed they hadn't. And that through discovery to trial, it would be proved that they had. They also contended that the sale was not inevitable, that at any time they could have walked away from the sale and decided not to sell the business. So disclosure was not inevitable. But the second circuit looked at that and said, yes, but we're not dealing with perfect predictions. It's a more harm than good standard. It's a rule eight pleading, and it should be judged based on what's more likely than not. What's more likely than not here is that through these product cases, investigations, and press reports after April 2017, which is when our class period begins, which is also several years after the securities class period begins, it became much more likely than not that this would come out through other means. And that makes this exactly like gender because there's no company out there that when a claim is successfully pleaded against them, simply throws up their hands and says, well, now we admit guilt. And therefore our stock should go down. They are free to, and indeed will, make sense of what they're accused of all the way through the case. All we're talking about here is whether an adequate claim has been pleaded at the initial stage. And the standard for that cannot be so high that it cannot be overcome without discovery that you can't get without getting your case through. Okay. Thanks. Thank you. Thank you very much. Counsel, have a great day. We will take this case.